UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

WAYNE MILLER, for himself and on behalf of all
others similarly situated,

     Plaintiff,

  -vs.-

WELLS FARGO BANK, N.A., WELLS FARGO
INSURANCE, INC., ASSURANT, INC. and
AMERICAN SECURITY INSURANCE COMPANY,

     Defendants.

---------------------------------------------------------------- x

   :  Docket No. 13-cv-1541 (VB)

**REPLY MEMORANDUM OF THE WELLS FARGO DEFENDANTS
IN FURTHER SUPPORT OF THEIR
<u>MOTION TO DISMISS THE CORRECTED CLASS ACTION COMPLAINT</u>**

    HOGAN LOVELLS US LLP
     Lisa J. Fried
     Leah Rabinowitz
    875 Third Avenue
    New York, New York 10022
    Tel: (212) 918-3000
    Fax: (212) 918-3100

    SEVERSON & WERSON
     Adam Shajnfeld
    One Embarcadero Center, Ste. 2600
    San Francisco, California 94111
    Tel: (415) 398-3344
    Fax: (415) 956-0439

    *Attorneys for Defendants Wells Fargo Bank,
    N.A. and Wells Fargo Insurance, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARGUMENT ...................................................................................................................... 2

    I.      The "Backdating" Theory Is Contrary To Contract, And Implausible .................... 2

    II.     The "Kickback" Theory Is Precluded By The Filed-Rate Doctrine ....................... 5

    III.    Federal Law Preempts Miller's State-Law Claims ................................................. 7

    IV.    The Complaint Fails To State Any RICO Claim ..................................................... 9

         A.      The Complaint Fails To Allege A Misrepresentation, Or Scheme To Defraud ...................................................................................................... 9

         B.      The Complaint Fails To Plausibly Allege Anyone's Reliance ................. 12

    V.      The Fiduciary Duty Claim Fails .......................................................................... 13

CONCLUSION ................................................................................................................. 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

*Abels v. JPMorgan Chase Bank, N.A.*,
  678 F. Supp. 2d 1273 (S.D. Fla. 2009) ..............................................................5, 6

*Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*,
  524 U.S. 214 (1998)..............................................................................................7

*Animalfeeds Intern. Inc. v. Banco Espirito Santo E Comercial De Lisboa*,
  101 Misc. 2d 379, 420 N.Y.S.2d 954 (Sup. Ct. N.Y. Cnty. 1979) ............................5

*Baptista v. JPMorgan Chase Bank, N.A.*,
  640 F.3d 1194 (11th Cir. 2011) ...............................................................................9

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008).............................................................................................12

*Calabrese v. CSC Holdings, Inc.*,
  No. 02-cv-5171 (DLI) (JO), 2009 WL 425879 (E.D.N.Y. Feb. 19, 2009)...........12

*Cannon v. Wells Fargo Bank, N.A.*,
  --- F. Supp. 2d ---, 2013 WL 132450 (N.D. Cal. Jan. 9, 2013)..........................4, 5

*Cannon v. Wells Fargo Bank, N.A.*,
  No. C-12-1376 (EMC), 2013 WL 3388222 (N.D. Cal. July 5, 2013) .............3, 4, 5

*Casey v. Citibank, N.A.*,
  No. 5:12-CV-820, 2013 WL 11901 (N.D.N.Y. Jan. 2, 2013)..........................13, 14

*Davis v. Dime Sav. Bank*,
  158 A.D.2d 50, 557 N.Y.S.2d 775 (3d Dep't 1990)......................................13, 14

*Egnotovich v. Katten Muchin Zavis & Roseman LLP*,
  No. 604101/06, 18 Misc. 3d 1120(A), 2008 WL 199757 (Sup. Ct. N.Y. Cnty. Jan. 23,
  2008), *aff'd* 55 A.D.3d 462, 866 N.Y.S.2d 156 (1st Dep't 2008) ........................14

*Ellsworth v. U.S. Bank, N.A.*,
  908 F. Supp. 2d 1063 (N.D. Cal. 2012) ..............................................................3, 5

*Gorham-Dimaggio v. Countrywide Home Loans, Inc.*,
  592 F. Supp. 2d 283 (N.D.N.Y. 2008), *aff'd* 421 F. App'x 97 (2d Cir. 2011) .............13, 15

*Gustafson v. BAC Home Loans Servicing, LP*,
  No. SACV 11-915-JST, 2012 WL 7071488 (C.D. Cal. Dec. 26, 2012)..................11

*Haehl v. Wash. Mut. Bank, F.A.*,
  277 F. Supp. 2d 933 (S.D. Ind. 2003) ...............................................................................8, 9

*In re W.T. Grant Co.*,
  699 F.2d 599 (2d Cir. 1983) ...............................................................................................14

*Kunzelmann v. Wells Fargo Bank, N.A.*,
  No. 11-cv-81373 (DMM), 2012 WL 2003337 (S.D. Fla. June 4, 2012) ........................5, 6, 8

*Kunzelmann v. Wells Fargo Bank, N.A.*,
  No. 11-cv-81373 (DMM), 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ........................5, 6, 8

*LaCroix v. U.S. Bank, N.A.*,
  No 11-3236, 2012 WL 2357602 (D. Minn. June 20, 2012).................................................1, 3

*Lane v. Wells Fargo Bank, N.A.*,
  No. C-12-04026 (WHA), 2013 WL 269133 (N.D. Cal. Jan. 24, 2013)....................................1

*Lass v. Bank of Am.*,
  695 F.3d 129 (1st Cir. 2012) ..................................................................................................3

*Lyons v. First Am. Title Ins. Co.*,
  No. C09-4156 (PJH), 2009 WL 5195866 (N.D. Cal. Dec. 22, 2009)......................................7

*MacKay v. Super. Ct.*,
  188 Cal. App. 4th 1427 (2d Dist. 2010)..................................................................................5

*Marguiles v. Chase Manhattan Mortg. Corp.*,
  No. L-5812-03, 2005 WL 2923580 (N.J. Super. App. Div. Nov. 7, 2005) ...........................14

*Martinez v. Wells Fargo Home Mortg., Inc.*,
  598 F.3d 549 (9th Cir. 2010) .................................................................................................8

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*,
  904 F.2d 786 (1st Cir. 1990)................................................................................................10

*McKenzie v. Wells Fargo Home Mortg., Inc.*,
  No. C-11-04965 (JCS), 2012 WL 5372120 (N.D. Cal. Oct. 30, 2012) ..................................1

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
  863 F. Supp. 2d 928 (N.D. Cal. 2012) ...................................................................................3

*Mellon Bank, N.A. v. Foster*,
  No. 90-764, 1990 WL 10007676 (W.D. Pa. May 31, 1990) ...................................................7

*Menkis v. Whitestone Savs. & Loan Ass'n*,
  78 Misc. 2d 329, 356 N.Y.S.2d 485 (Dist. Ct. Nassau Cnty. 1974) .....................................15

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999).....................................................................................9

*Ozbakir v. Scotti*,
  764 F. Supp. 2d 556 (W.D.N.Y. 2011) ..................................................................12

*River Glen Assocs. v. Merrill Lynch Credit Corp.*,
  295 A.D.2d 274, 743 N.Y.S.2d 870 (1st Dep't 2002) ...........................................14

*Roberts v. Wells Fargo Bank, N.A.*,
  No. 12-cv-200, 2013 WL 1233268 (S.D. Ga. March 27, 2013) .........................5, 6

*Roussin v. AARP, Inc.*,
  664 F. Supp. 2d 412 (2009), *aff'd* 379 F. Appx. 30 (2d Cir. May 26, 2010)...........7

*Schilke v. Wachovia Mortg.*, FSB,
  820 F. Supp. 2d 825 (N.D. Ill. 2011) ......................................................................4

*Silverstein v. ING Bank, FSB*,
  No. 12-10015 (GAO), 2012 WL 4340587 (D. Mass. Sept. 21, 2012).....................8

*Surrey Strathmore Corp. v. Dollar Savs. Bank of N.Y.*,
  36 N.Y.2d 173, 366 N.Y.S.2d 107 (1975) .............................................................13

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010)...................................................................................12

*Webb v. Chase Manhattan Mortg. Corp.*,
  No. 05-cv-0548, 2008 WL 2230696 (S.D. Ohio May 28, 2008).............................4

*Weinberger v. Mellon Mortg. Co.*,
  No. CIV.A 98-2490, 1998 WL 599192 (E.D. Pa. Sept. 10, 1998) ........................11

*Williams v. Wells Fargo Bank, N.A.*,
  No. 11-21233-CIV, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011) ..........................8

*Winn v. Alamo Title Ins. Co.*,
  No. A-09-CA-214-SS, 2009 WL 7099484 (W.D. Tex. May 13, 2009) ...................7

## OTHER AUTHORITIES

Fed. R. Civ. P. 12 ..............................................................................................................1

http://www.occ.gov/news-issuances/bulletins/2013/bulletin-2013-10a.pdf....................3

Defendants Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (together, "Wells Fargo") submit this reply memorandum of law in further support of their motion to dismiss[1] the Corrected Class Action Complaint dated April 3, 2013 (the "Complaint") of Plaintiff Wayne Miller ("Miller"), pursuant to Fed. R. Civ. P. 12(b)(6).

All of Miller's state-law claims are predicated on his "backdating" and "kickback" theories, and each claim fails because those theories fail.[2]  The "backdating" theory is contrary to contract, and implausible; the "kickback" theory is precluded by the filed-rate doctrine; and both theories are preempted by federal law.  Miller's RICO claims fail for lack of a misrepresentation, a scheme to defraud, or reliance.  And Miller's fiduciary duty claim fails for the additional reason that there is no such duty in this context.  For these reasons—as explained in the Opening Memorandum and herein—the Court should dismiss the Complaint.[3]

---

[1]    Wells Fargo's opening brief is referred to as the "Opening Memorandum" "or "Opening Mem."

[2]    Accordingly, Wells Fargo will address the theories, but will not specifically address the contract, implied covenant, or General Business Law claims.

[3]    The Complaint contains stray allegations that Wells Fargo placed coverage exceeding Miller's outstanding loan balance.  It is unclear if Miller intends seriously to push this claim, but if he does, it should be rejected.  Mortgages give lenders discretion to determine the amount of coverage required, and a lender's interest in the property exceeds the outstanding loan balance.  For instance, if a hazard destroys the property and insurance is only sufficient to immediately repay the loan, the loan ceases to perform.  But a lender wants a performing loan, not immediate repayment.  A performing loan pays the lender principal *and* interest.  A lender also incurs origination costs to make a new loan replacing the repaid loan.  For these reasons, courts have held that it is reasonable, as a matter of law, to require coverage exceeding the outstanding loan balance.  *Lane v. Wells Fargo Bank, N.A.*, No. C-12-04026  (WHA), 2013 WL 269133, at *8 (N.D. Cal. Jan. 24, 2013); *McKenzie v. Wells Fargo Home Mortg., Inc.*, No. C-11-04965 (JCS), 2012 WL 5372120, at *16, *20 (N.D. Cal. Oct. 30, 2012); *LaCroix v. U.S. Bank, N.A.*, No 11-3236 (DSD/JJK), 2012 WL 2357602, at *6-7 (D. Minn. June 20, 2012).

## ARGUMENT

### I.   THE "BACKDATING" THEORY IS CONTRARY TO CONTRACT, AND IMPLAUSIBLE[4]

Following Miller's "backdating" theory, a bank could not obtain retroactive coverage for a past period of lapse, nor charge the borrower for that coverage, even though the borrower's breach necessitated it.  This theory begs a slew of crucial, yet unanswered, questions:

- How is a bank to protect collateral—as is its contractual right—if it cannot retroactively place insurance upon discovering a borrower's failure, in breach of contract, to maintain his own?

- How is a bank to know, once it discovers that a borrower let his policy lapse, whether there was damage during that lapse (especially when the bank has millions of borrowers)?  Even if it could know, why is it under a duty to make that determination?

- If there is damage during that period of lapse, what protects the bank against loss, and how is retroactive coverage "worthless" if it protects against that considerable risk?

- What if damage occurs during that lapse, but its effect is not apparent until much later (such as mold or structural weakening)?  Even if a borrower were communicating with a bank about his breach—a rarity—and even if a bank could simply take a borrower's word that there had been no damage—which no prudent bank could—what happens when the borrower is not aware of the damage?  Absent coverage effective on the lapse date, what protects the bank?

(*See generally* Opening Mem. at 9-11.)

In addition to begging these questions, the "backdating" theory leads to absurd results. On Miller's theory, if a property is damaged during a period of lapsed coverage, neither the bank nor the borrower has any protection.   Additionally, even if a bank could obtain retroactive coverage to insure against that risk, the bank could not charge the borrower, despite the borrower's breach.   This would *encourage borrowers to hide their breaches* for as long as possible; borrowers could rely on banks to act prudently and obtain LPI, and borrowers could

---

[4]   Miller contends that Wells Fargo "does not deny that it backdates" LPI.  (Opp. at 18.)  That is preposterous, given that on this motion, Wells Fargo must assume the truth of that allegation.  Wells Fargo does not concede that it engages, or ever engaged, in "backdating."

avoid paying for that coverage by accusing banks of "backdating."  Miller does not address any of the questions raised by his theory or attempt to account for its consequences.  Instead, he offers a string of cases which have refused to dismiss the "backdating" theory, (*see* Opp. at 8-10) though none address these problems, and many simply rely, without substantial analysis, on each other.

For instance, Miller block-quotes *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 962 (N.D. Cal. 2012), which stated that "backdating was unsupported by any reason" other than a motivation to profit.  Not surprisingly, the defendants there offered no justification for backdating; Wells Fargo cannot be penalized for their briefing.  Similarly unavailing is *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1085-86 (N.D. Cal. 2012), which did not address the questions Wells Fargo raises, and instead relied on *McNeary-Calloway*.[5]  For these and other reasons, the most recent decision on "backdating" expressly <u>declined</u> to follow *Ellsworth* and *McNeary-Calloway*, and dismissed the backdating theory for failure to state a plausible claim.  *See Cannon v. Wells Fargo Bank, N.A.*, No. C-12-1376 (EMC), 2013 WL 3388222 (N.D. Cal. July 5, 2013) (rejecting theory in analogous context of flood insurance because, *inter alia*, "some damage may not be readily apparent" during period of lapse, and thus it was reasonable, as a matter of law, to purchase insurance to cover that period).

*Cannon* accords with other cases to have critically considered just some of these issues

---

[5]   *Lass v. Bank of Am.*, 695 F.3d 129 (1st Cir. 2012)—which Miller cites (Opp. at 16)—did not address the issues Wells Fargo raises, and refused to affirm dismissal on two unpersuasive grounds.  First, that the property was insured during the period of lapse.  *Id.* at 139.  That—just like the claim that a "loss payable endorsement" provided duplicative coverage—does not mean "backdating" itself is improper; if duplicative coverage exists, it may be problematic regardless of whether it is "backdated" or prospective.  Second, that *proposed* regulatory guidance questioned if "backdating" was permitted by the National Flood Insurance Act.  The court does not appear to have been aware, however, that the guidance was only proposed for comment, was *never* adopted, met with heavy opposition for the risks it would cause, and was essentially withdrawn when the Act was amended to clarify that "backdating" was authorized.  *See* http://www.occ.gov/news-issuances/bulletins/2013/bulletin-2013-10a.pdf, at 3.

and thus rejected the "backdating" theory.  *See* Opening Mem. at 9-10; *LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602, at *5 (D. Minn. June 20, 2012); *Schilke v. Wachovia Mortg.*, FSB, 820 F. Supp. 2d 825, 834 (N.D. Ill. 2011); *Webb v. Chase Manhattan Mortg. Corp.*, No. 05-cv-0548, 2008 WL 2230696, at *19 (S.D. Ohio May 28, 2008).  The Opposition does not address *any* of these cases.

These cases are consistent with regulations issued by the Consumer Financial Protection Bureau ("CFPB") *expressly authorizing* backdating.  (*See* Opening Mem. at 10.)  Miller argues—as Wells Fargo noted—that these regulations are recent.  (Opp. at 10.)  That misses the point.  "Backdating" was never prohibited by any law or contract.  And how can "backdating" be unfair, deceptive, unconscionable, or motivated solely by a desire for profit if it has been approved *by the very agency charged with protecting consumers*?  The obvious answer is that, notwithstanding the pejorative label, the practice is permissible and sensible.[6]

It is not necessary to reach beyond the pleadings to dispose of the "backdating" theory.  Retroactive placement of insurance ensures continuous protection of property, reduces risk to borrowers and banks from gaps in coverage of thousands of properties, and discourages borrowers from breaching their obligation to maintain insurance.  As a matter of law, Miller must do more than present the conclusory assertion that backdating is "unfair" or "worthless."  Here, he has not attempted to do so.  Accordingly, to the extent his claims are predicated on the "backdating" theory, they should be dismissed.[7]

---

[6]   Miller claims that the National Flood Insurance Act does not authorize backdating.  (Opp. at 18.)  While not dispositive in this hazard case, Miller is wrong.  *See Cannon*, 2013 WL 3388222.  Miller also argues that the Act does not "*require* backdating."  (Opp. at 18.)  Wells Fargo never argued that the Act required "backdating," but only that it was authorized.

[7]   Miller also argues that "backdating" breached the Mortgage.  (*See* Opp. at 13.)  That claim fails.  In providing that insurance "shall be . . . for the periods of time required by Lender," (Mortg. ¶ 5) the "mortgage permits backdating."  *Cannon*, 2013 WL 3388222.  And for all the reasons described above and in the Opening

(footnote continued)

4

## II.   THE "KICKBACK" THEORY IS PRECLUDED BY THE FILED-RATE DOCTRINE

Under the filed-rate doctrine, rates filed with the Department of Financial Services are not subject to challenge in court, and are indeed the *only* rates which may legally be charged. (Opening Mem. at 11-14.)  Miller does not dispute that the LPI rate was filed and approved or that the commissions at issue were components of that rate.  Instead, Miller argues that he is challenging "manipulation of the force-placed insurance market, and the kickbacks . . . not the filed premium rates."  (Opp. at 9.)  That argument, however, suffers from two flaws: (1) one cannot separate a rate from a practice allegedly inflating that rate, and (2) one cannot have suffered damages by being charged the only rate legally permitted to be charged.  None of the cases Miller cites adequately addresses these flaws and, as discussed below, a recent case rejected a similar argument after identifying these same defects.

Miller cites, *inter alia*, to *Ellsworth*, *Cannon*, *Kunzelmann*, and *Abels*.  (Opp. at 9-10.) None adequately addresses the flaws identified above.  *Ellsworth* held, incorrectly,[8] that there was no California filed-rate doctrine, and concluded, *without explanation*, that "[j]ust because the damages are based on increased costs incurred as a result of the alleged kickback scheme does not transform a challenge to conduct and practices into a challenge to the premiums."[9] *Cannon* relied on *Kunzelmann* and *Abels*.[10]  That reliance, however, was misplaced, as "[n]either

---

Memorandum, "backdating" is, as a matter of law, a reasonable exercise of a lender's discretion.  Miller has not plausibly alleged otherwise, and cannot express shock that Wells Fargo would vindicate its contractual right to continuous coverage.

[8]   *See MacKay v. Super. Ct.*, 188 Cal. App. 4th 1427, 1448-49 (2d Dist. 2010) (recognizing state filed-rate doctrine applicable to insurance rates).

[9]   *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1081-82 (N.D. Cal. 2012) (failing to address that commissions were a component of the approved premium).

[10]   *Cannon v. Wells Fargo Bank, N.A.*, --- F. Supp. 2d ---, 2013 WL 132450, at *9 (N.D. Cal. Jan. 9, 2013); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373 (DMM), 2012 WL 2003337 (S.D. Fla. June 4, 2012); *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273 (S.D. Fla. 2009).

case is binding precedent or persuasive." *Roberts v. Wells Fargo Bank, N.A.*, No. 12-cv-200, 2013 WL 1233268, at *12 (S.D. Ga. March 27, 2013) (referring to *Abels* and *Kunzelmann*).  In *Roberts*, an LPI case involving an identical "kickback" theory, the court rejected the same argument Miller makes:

> Even accepting the dubious notion that Roberts (and thus the plaintiffs from *Abel* and *Kunzelmann*) challenges the method of choosing an insurer and not the rate itself, the filed rate doctrine still potentially applies. Whatever else might be said about Roberts's claims, the damages she seeks can only be measured by the difference between the premiums she paid and what the premiums would have been absent the allegedly illegal "commissions, kickbacks, and free services" they contained.   To calculate that amount "would, in effect, result in a judicial determination of the reasonableness["] of the premium Roberts paid.

*Id.* at *13 (internal citations omitted).

Miller's reliance on *Kunzelmann*—from which he quotes an entire paragraph—is especially puzzling, because that court later recognized that it had been misled into refusing to apply the filed-rate doctrine.  In a subsequent decision, the court noted that "[i]n denying the motion to dismiss, [it] relied on Plaintiff's argument that he was not challenging the actual insurance rates, but rather . . . unearned kickbacks." *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-cv-81373 (DMM), 2013 WL 139913, at *11-12 (S.D. Fla. Jan. 10, 2013).  That reliance was, as the court realized, misplaced.   Contrary to plaintiff's argument, "the 'unearned' commission . . . is part of the rate filed by the insurance carrier in each state," and thus it was "apparent that the filed-rate doctrine is an issue that must be addressed." *Id.*

Miller challenges a component of the rate—the commission—and his damages would constitute a refund of that component.  Here, just as in *Roberts*, "[r]egardless of the spin put on [Plaintiffs'] allegations and claims, at bottom th[e] case calls for relief that itself triggers

6

application of the filed rate doctrine." *Id.* at *13 n.9.[11]

Miller also argues that Wells Fargo cannot invoke the filed-rate doctrine because it is not subject to oversight by insurance regulators. (Opp. at 12.) That is immaterial. What matters is that the *rate* is subject to regulation—the same rate Wells Fargo passed on to Miller. It makes little sense that an insurer could charge that rate, but Wells Fargo could not pass it to a borrower. An approved rate—indeed the only which can be charged—cannot be legal in the insurer's hand, and illegal in another's. That is exactly why Judge Marrero has applied the filed-rate doctrine to bar claims against a non-insurer. *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 419 (2009), *aff'd* 379 F. Appx. 30 (2d Cir. May 26, 2010).[12] Accordingly, to the extent Miller's claims are predicated on the "kickback" theory, they should be dismissed.

## III.   FEDERAL LAW PREEMPTS MILLER'S STATE-LAW CLAIMS

The National Bank Act ("NBA") preempts Miller's state-law claims because the relief he seeks would more than "incidentally affect" Wells Fargo's ability to obtain insurance to protect collateral and assess loan-related fees. (*See* Opening Mem. at 15-16.)

The NBA expressly preempts laws affecting a bank's ability to require or obtain collateral-protection insurance. Insofar as Miller seeks to prohibit retroactive placement of LPI, he *is* severely limiting Wells Fargo's ability to obtain collateral-protection insurance. That

---

[11]   *See Winn v. Alamo Title Ins. Co.*, No. A-09-CA-214-SS, 2009 WL 7099484, at *2, *9 (W.D. Tex. May 13, 2009) (rejecting, as "disingenuous," plaintiffs' contention that "they are not seeking to undo a rate, but are seeking 'merely to recover damages based on defendants' illegal conduct'" of colluding to submit inflated rates reflecting kickbacks, and holding that such allegations "clearly rest on the amount paid . . . for title insurance," triggering the filed-rate doctrine); *Lyons v. First Am. Title Ins. Co.*, No. C09-4156 (PJH), 2009 WL 5195866, at *5-7 (N.D. Cal. Dec. 22, 2009) (statutory analogue to filed-rate doctrine precluded plaintiffs' claim that an insurer acted unfairly in applying the higher of two filed rates, despite plaintiffs' assertion that they were challenging the "application" of those rates, and not their "actual content or setting"). *See also Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223 (1998) (applying federal filed-rate doctrine, rejecting argument that complaint merely challenged practices and not rates, and noting that "[r]ates . . . do not exist in isolation," because if they did, "[a]ny claim for excessive rates [could] be couched as a claim for inadequate services").

[12]   Miller argues that *Roussin* is unpersuasive because it cited to a decision from outside this District. (Opp. at 11 n.17.) Of course, judges are free to rely on the wisdom of decisions from other jurisdictions.

limitation triggers preemption.  *See Mellon Bank, N.A. v. Foster*, No. 90-764, 1990 WL 10007676, at *5 (W.D. Pa. May 31, 1990) (applying preemption and enjoining state regulator's challenge to "the use of integral parts of [bank]'s collateral protection program"); *Silverstein v. ING Bank, FSB*, No. 12-10015 (GAO), 2012 WL 4340587 (D. Mass. Sept. 21, 2012) (state law which, though it did not challenge right to place insurance, nonetheless regulated amount of coverage, was preempted).  The fact that the CFPB has interpreted federal law now to authorize "backdating" demonstrates that the matter is for federal—not state—regulation.

Similarly, the NBA expressly preempts laws affecting a bank's ability to assess fees.  *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549 (9th Cir. 2010) (NBA preempted challenge to Wells Fargo allegedly marking-up fee its affiliate charged for tax services, and to fee alleged to have been "excessive because it was not reasonably related to Wells Fargo's actual costs").  *See also* OTS Letter P-99-3, 1999 WL 413698 (March 10, 1999) (noting in analogous context of Home Owner's Loan Act that claim would be preempted if used to limit a bank's "choice of insurers or premiums to be charged on the forced placement of insurance").[13]

Miller responds that his claims invoke state law of general applicability.  (Opp. at 42-43.) That misses the point.  Claims do not exist in isolation; the preemption analysis cannot end as soon as a claim is identified as one of tort or contract.[14]  Otherwise, a plaintiff could always evade preemption by casting any challenge to banking activities as a breach of a (nebulous) implied covenant or a violation of a state statute prohibiting "unfair" practices.  *See, e.g.*, *Haehl*

---

[13]   Contrary to Miller's claim, (Opp. at 41) it is not inconsistent to argue that challenges to the fee for LPI are both preempted and precluded.  This is a unique case—the precise fee that Wells Fargo charges is that which a state regulator approved.  However, even if there were inconsistency, Wells Fargo is permitted to seek dismissal on alternative grounds.

[14]   The cases that Miller cites make this mistake, and also do not appear to analyze preemption of the "backdating" theory.  *See Kunzelmann v. Wells Fargo Bank, N.A.*, 2012 WL 2003337, at *5 (S.D. Fla. June 4, 2012); *Williams v. Wells Fargo Bank, N.A.*, No. 11-21233-CIV, 2011 WL 4901346, at *9-10 (S.D. Fla. Oct. 14, 2011).

*v. Wash. Mut. Bank, F.A.*, 277 F. Supp. 2d 933, 942-43 (S.D. Ind. 2003) (focusing on the "effect" that "[a] decision in plaintiffs' favor would have," rather than the general nature of the claims, and dismissing claims predicated on allegation that a bank had charged a fee for a service it did not perform, because "[a] decision in plaintiffs' favor would have the same effect as a direct regulation of fees: to determine the circumstances under which [the bank] may charge its customers . . . a loan-related fee"). *See also Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 (11th Cir. 2011) (NBA preempted unjust enrichment claim when applied to limit ability to assess check-cashing fee).[15]

It is obvious what Miller seeks by way of his state-law claims: a judicial determination that banks cannot (1) ensure continuous coverage by obtaining retroactive insurance or (2) assess a fee or commission for obtaining that insurance.  These are serious matters that would create significant risks to the banking industry and national economy associated with uninsured property, and radically alter the fee structure of servicing.  Whatever their merits, there is nothing "incidental" about their effect.  Accordingly, Miller's state-law claims must be dismissed as preempted.

## IV.   THE COMPLAINT FAILS TO STATE ANY RICO CLAIM

### A.   The Complaint Fails To Allege A Misrepresentation, Or Scheme To Defraud

The Complaint's entire RICO section does not identify *any* alleged misrepresentation. (Opening Mem. at 17-18.)  In response, Miller now attempts two cobble together two (alleged) misrepresentations.  Neither, however, is actually a misrepresentation.[16]

---

[15]   While it is true that the NBA would not preempt a claim of breach tethered to a contractual provision, and a claim of fraud tethered to an actual misrepresentation, Miller has not adequately alleged either here.  Instead, his claims are a smokescreen for expansive regulatory reform.

[16]   Miller also argues—citing only out-of-circuit cases—that "no misrepresentation of fact is required in order to establish a scheme to defraud." (Opp. at 31.)  The Second Circuit, however, has stated that "[f]or RICO liability

(footnote continued)

1.    The First Alleged Misrepresentation

The first alleged misrepresentation is this statement, contained in a notice Miller received: "Because this policy will insure your property without inspection, the cost may be higher than the amount you would pay if you were to purchase coverage from an insurance company of your choice."  (Opp. at 33.)  According to Miller, this is false for two reasons.

First, Miller claims that a "lack of underwriting . . . is a factor which should reduce the cost of insurance."  (*Id.*)  But that claim is implausible, and cannot be credited.  While a lack of underwriting may, as Miller notes, reduce the cost of having an underwriting function, it ultimately would *increase* costs to insurers (and, by proxy, insureds) because absent underwriting, an LPI provider would insure very risky properties—including properties that could not be insured in the open market.  That is why life insurance policies purchased from companies that do not require medical exams, and credit obtained from lenders that do not perform credit checks, are always more—not less—expensive than underwritten products.  In any event, the statement says merely that the cost "may" be higher for that reason.  It does not say that it "will" or "must" be higher.

Second, Miller claims that the notice does not disclose that the cost for LPI is also higher because of the commission.  That too makes little sense.  Wells Fargo never stated that the lack of underwriting was the *only* reason for the increased cost.  Moreover, Miller cites *no* authority for the notion that Wells Fargo was required to disclose all or any of the reasons for the increased

---

to exist . . . , the defendant must have made misrepresentations . . . ."  *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 (2d Cir. 1999).  But even if no misrepresentation were required, Miller would fare no better.  Miller does not—because he cannot—explain how he will establish fraud without identifying a misrepresentation.  Moreover, the case he cites requires a "scheme . . . intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct."  *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791-92 (1st Cir. 1990) ("We do not see how the alleged illegal kickbacks . . . could themselves be construed as a scheme to deceive . . . .").  Miller does not allege *any* deceptive conduct— misrepresentation or otherwise.

cost.  Finally, the notices *did* disclose that Wells Fargo might receive a commission and that LPI could be more expensive.

Numerous courts have rejected Miller's "fraud by omission" argument.  In *Gustafson*, a lender accused of receiving "kickbacks" was alleged to have "misrepresent[ed] the reasons for the high cost of force-placed insurance."  *Gustafson v. BAC Home Loans Servicing, LP*, No. SACV 11-915-JST, 2012 WL 7071488, at *5 (C.D. Cal. Dec. 26, 2012).  In dismissing the RICO claim, the court noted that it "fail[ed] to see how Defendants' failure to inform Plaintiffs and class members that force-placed insurance practices also generated profits for Defendants is a material omission 'reasonably calculated to deceive' Plaintiffs."  *Id.*  Similarly, in *Weinberger*, plaintiffs alleged "a kickback scheme in which [lender] allegedly receives a kickback or commission of sorts from [insurer] from excessively high insurance rates charged to mortgagors whose home insurance coverage was force-placed."  *Weinberger v. Mellon Mortg. Co.*, No. CIV.A 98-2490, 1998 WL 599192, at *5 (E.D. Pa. Sept. 10, 1998).  There, too, the court dismissed the RICO claim, as it could not see "how letters that warn of an imminent bad deal and urge one to seek better, could possibly be calculated to deceive anyone."  *Id.* (citation omitted).[17]

### 2.   The Second Alleged Misrepresentation

The second alleged misrepresentation is Wells Fargo's request that Miller "reimburse [it] for the premium [it] advanced to secure coverage for [Miller]."  (Opp. at 34.)  According to Miller, that statement gave "the false impression that Wells Fargo was passing on to him the charges the bank had actually incurred."  (*Id.*)  But the statement *is true*; Wells Fargo passed the

---

[17]   The Opposition tries to distinguish these fatal cases by claiming that they involved "fraud in the inducement."  (Opp. at 35-36.)  Those cases are no more or less about "inducement" than is this case, but even if they were, it is a distinction without a difference.  Here, as in *Gustafson* and *Weinberger*, there was no scheme to defraud, and no misrepresentation, *at any time* (whether at purchase or during the LPI policy period).  As *Gustafson* and *Weinberger* make clear, there is no scheme to defraud—at any time—where the borrower is warned that LPI is a bad deal.

filed and approved premium (which included a commission) on to Miller.  Moreover, Miller cannot claim that he was misled into thinking Wells Fargo did not receive money in connection with LPI because, as just noted,  he was notified of same.

### B.      The Complaint Fails To Plausibly Allege Anyone's Reliance

Miller cannot plausibly allege reliance.   (Opening Mem. at 20-21.)   It is utterly implausible that Miller was willing to accept a bad deal, but would not have done so if he knew all—rather than, as he alleges, some—of the reasons why it was a bad deal.[18]

Recognizing as much, Miller—misreading *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)—argues that he is not required to prove reliance.  (Opp. at 40.)  Miller does not, however, address the cases Wells Fargo cited on this point, which make clear that even after *Bridge*, causation requires *someone's* reliance—and since Miller's claim is predicated on his having been deceived, that "someone" is him.  *See* Opening Mem. at 20 n.12; *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010) (requiring third-party reliance); *Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 574 n.4 (W.D.N.Y. 2011) (discussing *Bridge*, and noting that "[i]n the case at bar, which does not involve any third-party reliance, it is difficult to see how plaintiffs could show causation . . . without showing that they relied on some representation . . . "); *Calabrese v. CSC Holdings, Inc.*, No. 02-cv-5171 (DLI) (JO), 2009 WL 425879, at *12 (E.D.N.Y. Feb. 19, 2009) (discussing *Bridge*, and holding that "where the only misrepresentations at issue are those that the defendants made directly to each victim . . . , a putative plaintiff cannot establish that his injury was proximately caused by the RICO violation

---

[18]   Moreover, Miller's own allegations undercut his related argument that he was "lulled into complacency" by Wells Fargo's representations and communications to him.  Miller claims that after LPI was in place, he purchased his own insurance—not the action of somebody who had been "lulled into complacency."

if he cannot allege and prove that he personally relied on the misrepresentations").[19] Accordingly, the RICO claim should be dismissed.

## V.   **THE FIDUCIARY DUTY CLAIM FAILS**

In the Opening Memorandum, Wells Fargo explained that it did not owe Miller a fiduciary duty. (Opening Mem. at 22-24.) *See Gorham-Dimaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 294 (N.D.N.Y. 2008) ("[A]bsent specific language in a mortgage establishing a fiduciary obligation, a mortgagee owes no fiduciary duty to a mortgagor with respect to the escrow account[.]"), *aff'd* 421 F. App'x 97 (2d Cir. 2011) (citing *Surrey Strathmore Corp. v. Dollar Savs. Bank of N.Y.*, 36 N.Y.2d 173, 176-78, 366 N.Y.S.2d 107, 115 (1975)).

Miller concedes, as he must, that a "lender-creditor relationship generally does not give rise to a fiduciary duty." (Opp. at 22.) However, Miller claims that a fiduciary duty arose because of a standard escrow provision in the mortgage—Paragraph 3—and cites two non-binding decisions—*Casey* and *Davis*[20]—that offer no compelling analysis and fail to address *Surrey*. (*See id.* at 22-23.) In *Surrey*, the Court of Appeals held that a party's obligations under an escrow agreement depend on "what rights and obligations the parties are found to have intended to create as manifested by the words they used in their written agreement . . .," and not on the use of terms such as "escrow" or "trust." *Surrey*, 36 N.Y.2d at 175-76, 366 N.Y.S.2d at 110.

---

[19] The Second Circuit case Miller cites involved alleged securities violations, an obviously distinguishable context in which *reliance is presumed* given the "fraud on the market" theory. (*See* Opp. at 40 (citing *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134 (2d Cir. 2001)).)

[20] *Casey v. Citibank, N.A.*, No. 5:12-CV-820, 2013 WL 11901 (N.D.N.Y. Jan. 2, 2013); *Davis v. Dime Sav. Bank*, 158 A.D.2d 50, 557 N.Y.S.2d 775 (3d Dep't 1990).

Neither *Casey* nor *Davis* explain how the contractually-delineated ability to charge certain expenses to a standard mortgage escrow account is the "specific language" necessary to elevate a mortgagor-mortgagee relationship into a fiduciary one.  Nor could they.  If such a provision was the only thing necessary to overcome the rule that lenders do not owe fiduciary duties to borrowers,[21] there would be no more rule.  As one court noted in rejecting a similar argument, "to hold that the placement of . . . funds . . . into an escrow account for the purpose of paying property taxes on mortgage loans . . . gave rise to a fiduciary duty between a bank and the mortgagor" would be to hold "that every single mortgage loan that exists in the entire United States gives rise to a fiduciary relationship between a bank and its customer."  *Marguiles v. Chase Manhattan Mortg. Corp.*, No. L-5812-03, 2005 WL 2923580, at *3 (N.J. Super. App. Div. Nov. 7, 2005).  *Casey* and *Davis* are outliers that should not be followed; there is no fiduciary duty here.

Even assuming that Paragraph 3 of the Mortgage somehow gave rise to a fiduciary duty, Miller's claim would still fail.  Courts will not impose any obligations—fiduciary or otherwise—beyond those specified in an escrow provision.  "An escrow agreement is a contract.  It necessarily follows that plaintiffs cannot impose upon [defendant] any obligations in addition to its limited duties under the express terms of the contract."  *Egnotovich v. Katten Muchin Zavis & Roseman LLP*, No. 604101/06, 18 Misc. 3d 1120(A), 2008 WL 199757 at *6 (Sup. Ct. N.Y. Cnty. Jan. 23, 2008), *aff'd* 55 A.D.3d 462, 866 N.Y.S.2d 156 (1st Dep't 2008) (internal citation and quotation marks omitted).  Thus, to find a breach of duty, there "must be an agreement which not only defines and obligates this defendant to perform a certain act, but there must also

---

[21]   *See e.g.*, *In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir. 1983) (a creditor has no fiduciary obligation to its debtor); *River Glen Assocs. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275, 743 N.Y.S.2d 870 (1st Dep't 2002) ("[T]his Court has repeatedly held [that] an arm's length borrower-lender relationship is not of a confidential or fiduciary nature. . . .").

be a breach of an act to be performed by defendant under the agreement." *Menkis v. Whitestone Savs. & Loan Ass'n*, 78 Misc. 2d 329, 331, 356 N.Y.S.2d 485, 488 (Dist. Ct. Nassau Cnty. 1974) (rejecting claim predicated on escrow provision); *Animalfeeds Intern. Inc. v. Banco Espirito Santo E Comercial De Lisboa*, 101 Misc. 2d 379, 383, 420 N.Y.S.2d 954 (Sup. Ct. N.Y. Cnty. 1979).

Here, as relevant, Wells Fargo was obligated simply to hold the funds in a federally-insured account and "use [them] to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law." (Mortg. ¶ 3(b).) Miller does not—indeed, cannot—allege that Wells Fargo failed to use the funds to pay the Escrow Items in a timely manner. Miller's inability to allege that the Wells Fargo Defendants breached their obligations under Paragraph 3 dooms his fiduciary duty claim. Moreover, by invoking a slew of duties nowhere to be found in Paragraph 3, Miller improperly attempts to "expand the very limited circumstances in which a fiduciary duty may be imposed. Courts have consistently rejected this sort of attempt to impose a heightened obligation on all aspects of the debtor-creditor relationship simply because the mortgagee makes payments from an escrow account on behalf of the mortgagor." *Gorham-DiMaggio*, 592 F. Supp. 2d at 295. Accordingly, Miller's claim for breach of fiduciary duty should be dismissed.

## CONCLUSION

For all of the reasons stated here and in the Opening Memorandum, the Court should dismiss the Complaint.

Dated: July 19, 2013

Respectfully submitted,

HOGAN LOVELLS US LLP

By:   /s/ Lisa J. Fried
       Lisa J. Fried
       Leah Rabinowitz
875 Third Avenue
New York, NY 10022
Tel: 212-918-3000
Fax: 212-918-3100
lisa.fried@hoganlovells.com
leah.rabinowitz@hoganlovells.com

SEVERSON & WERSON
Adam Shajnfeld
One Embarcadero Center, Ste. 2600
San Francisco, California 94111
Tel: (415) 398-3344
Fax: (415) 956-0439

*Attorneys for Defendants Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc.*

16

## CERTIFICATE OF SERVICE

I, Lisa J. Fried, hereby certify that on the 19th day of July, 2013, I caused true and correct copies of the above Reply Memorandum of the Wells Fargo Defendants in Further Support of Their Motion to Dismiss the Corrected Class Action Complaint, dated July 19, 2013, to be served via ECF upon:

LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway, Suite 509
White Plains, New York 10601-2301
*Attorneys for Plaintiff Wayne Miller*

PRESKA & ASSOCIATES, P.C.
235 Main Street, Fourth Floor
White Plains, New York 10601
*Attorneys for Plaintiff Wayne Miller*

SULLIVAN & WORCESTER LLP
1633 Broadway
New York, New York 10019
*Attorneys for Defendants Assurant, Inc. and American Security Insurance Company*

JORDEN BURT LLP
1025 Thomas Jefferson Street NW, Suite 400 East
Washington, DC 20007
*Attorneys for Defendants Assurant, Inc. and American Security Insurance Company*

_____ /s/ Lisa J. Fried
Lisa J. Fried

New York, New York
July 19, 2013

17