

Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
T +1 212 918 3000
F +1 212 918 3100
www.hoganlovells.com

October 3, 2013

**By ECF**

Hon. Vincent L. Briccetti
United States Courthouse
300 Quarropas Street, Room 630
White Plains, New York 10601

Re:     *Miller v. Wells Fargo Bank, N.A., et al.*, No. 13-cv-01541-VB

Dear Judge Briccetti:

We are co-counsel to defendants Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (together, "Wells Fargo") in the above-referenced action.

We write to address *Rothstein v. Ally Fin., Inc.*, No. 12-cv-3412 (AJN) (S.D.N.Y. Sept. 30, 2013), which Plaintiff Wayne Miller ("Plaintiff" or "Miller") recently filed as supplemental authority. *Rothstein* refused to dismiss a RICO claim alleging that notices misrepresented the LPI premium as the "cost of the insurance." According to *Rothstein*, a borrower might interpret "cost of the insurance" to mean the lender's "net cost," which could be misleading because the premium included a commission. Respectfully, that decision should not guide the Court.

First, there is no dispute that Wells Fargo *did* pass on to Miller the exact amount the insurer charged for the policy, and Wells Fargo never claimed that the premium represented its *net* cost. More importantly, though, Miller *was notified that Wells Fargo would receive a commission*, thus negating any claim that he thought the premium was the "net cost." *See, e.g.*, Doc. No. 47-2 ("Wells Fargo Insurance . . . will receive a commission . . . ."). *Rothstein* does not address the import of such a disclosure, though *Gustafson* does. *Gustafson v. BAC Home Loans Servicing, LP*, 2012 WL 7071488, *7 (C.D. Cal. Dec. 26, 2012) (dismissing claim regarding LPI "profits" because borrower was notified of commission).

Second, even if a borrower could construe the LPI premium as a "net cost," and even if Wells Fargo had not disclosed that it would receive a commission, there is no plausible connection between that "misrepresentation" and any injury. After all, Miller does not dispute that Wells Fargo's notices urged borrowers to avoid LPI and listed some of its considerable downsides, including its high price. Miller cannot plausibly allege that he accepted LPI despite it being a bad, expensive deal he was urged to avoid, but would not have if he knew (which he did) that Wells Fargo received a commission from the transaction. Indeed, he *does not* so allege. *Rothstein* does not address this disconnect. Instead, it simply *assumes* that if a plaintiff can locate any misrepresentation amidst a slew of notices, that misrepresentation must have (plausibly) caused injury. That does not suffice for a RICO claim predicated on fraud.

*Rothstein*'s attempt to distinguish *Weinberger v. Mellon Mortg. Co.*, 1998 WL 599192 (E.D. Pa. Sept. 10, 1998), fails for a similar reason. According to *Rothstein*, *Weinberger* found that notices warning that LPI was a bad deal could not reasonably be calculated to "deceive plaintiffs into allowing their insurance to lapse . . . ." *Rothstein* distinguished its own allegations as involving a different scheme: that "costs" and "reimbursements" listed in the notices "were materially overstated." But that does not distinguish *Weinberger*, as the question still remains: even if amounts are overstated, how are notices that warn of a bad deal, and urge the borrower to seek a better one, calculated to lull a borrower into any form of complacency? What borrower thinks "I'll take a bad deal I can (and am urged to) avoid, but wouldn't if I

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Abu Dhabi  Alicante  Amsterdam  Baltimore  Beijing  Berlin  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  London  Los Angeles  Madrid  Miami  Milan  Moscow  Munich  New York  Northern Virginia  Paris  Philadelphia  Prague  Rome  San Francisco  Shanghai  Silicon Valley  Singapore  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices: Budapest  Jakarta  Jeddah  Riyadh  Zagreb. For more information see www.hoganlovells.com

knew an additional reason it was a bad deal?" Not Miller, as the lack of such an implausible allegation makes clear.[1]

Third, *Rothstein* misconstrues *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), as dispensing with reliance as an element of a RICO claim in a case such as this. *Rothstein* misreads *Bridge*, and does not cite, let alone discuss, binding and persuasive precedent to the contrary. *See In re U.S. Foodservice Inc. Pricing Litig.*, --- F.3d ----, 2013 WL 4609219, *8 (2d Cir. 2013) ("[I]n cases such as this . . . plaintiffs must also demonstrate reliance on a defendant's common misrepresentation to establish causation under RICO."); *UFCWLocal 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010) (discussing *Bridge*, and requiring third-party reliance where plaintiff's theory was that in prescribing drug, third-party doctors relied on drug company's alleged misrepresentation, causing harm to plaintiff, who paid for drug).

Specifically, *Rothstein* does not explain how a borrower can be injured by a misrepresentation, or a scheme to defraud, if the borrower does not plausibly allege reliance. *See Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 574 n.4 (W.D.N.Y. 2011) (discussing *Bridge*, and noting that "[i]n the case at bar, which does not involve any third-party reliance, it is difficult to see how plaintiffs could show causation . . . without showing that they relied on some representation . . . "); *Calabrese v. CSC Holdings, Inc.*, 2009 WL 425879, *12 (E.D.N.Y. Feb. 19, 2009) (discussing *Bridge*, and holding that "where the only misrepresentations at issue are those that the defendants made directly to each victim . . . , a putative plaintiff cannot establish that his injury was proximately caused by the RICO violation if he cannot allege and prove that he personally relied on the misrepresentations").

*Rothstein* also refused to apply the filed-rate doctrine because defendants "provided no authority to support the contention that the Court can, should, or must grant 'per se reasonable' status to rates designed and approved for lenders when those rates are secondarily billed by the lenders to borrowers instead." But here, Wells Fargo did. *See* Doc. No. 38 at 13; *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 419 (S.D.N.Y. 2009), *aff'd* 379 F. App'x 30 (2d Cir. May 26, 2010); Doc. No. 64 (attaching *Singleton v. Wells Fargo Bank, N.A.*, 2013 WL 5423917 (N.D. Miss. Sept. 26, 2013)). Moreover, *Rothstein* does not adequately explain how the same rate can be legal in one hand, and illegal in another. *See* Doc. No. 38 at 13; Doc. No. 56 at 7.

Thank you for Your Honor's consideration.

Respectfully submitted,

*Lisa J. Fried*

Lisa J. Fried
Partner
lisa.fried@hoganlovells.com
D +1 212 909 0658

cc:   David Harrison, Esq.
      Jeanne F. D'Esposito, Esq.
      Scott Papp, Esq.

---

[1] Moreover, *Weinberger* spoke more generally than *Rothstein* suggests, not limiting itself to a single conception of the "scheme": "The Court cannot see how letters that warn of an imminent bad deal and urge one to seek better, could possibly be calculated to deceive anyone. It is difficult to understand what plaintiffs claim the letter was intended to have defrauded them of or have deceived them into believing or doing." *Weinberger*, 1998 WL 599192, at *5.